Alonzo **ECHOLS**, Appellant,

v.

The **CITY OF RIVERSIDE**,
Missouri, Respondent.

No. WD 71560.

Missouri Court of Appeals,
Western District.

Dec. 21, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 2011.

Application for Transfer Denied
March 29, 2011.

Mark P. Schloegel and Nicholas J. Porto, Kansas City, MO, for appellant.

John A. Vering III and Dione C. Greene, Kansas City, MO, for respondent.

Before Division Four: LISA WHITE HARDWICK, Chief Judge, Presiding, GARY D. WITT, Judge, and KEITH MARQUART, Special Judge.

GARY D. WITT, Judge.

Alonzo Echols appeals the judgment of the trial court. For the reasons set forth herein we affirm in part and reverse in part.

### Statement of the Facts

Appellant, Alonzo Echols ("Echols") was employed by the Respondent, City of Riverside ("City"), in September of 2004. Echols was fired by the City in October of 2007. Echols claims the City discharged him in retaliation for a complaint of discrimination that Echols made to the Missouri Human Rights Commission ("Commission").

Echols worked for the City as a custodian. Prior to May 1, 2007, Echols had received a number of unwritten complaints about his job performance. On May 1, 2007, Echols filed a written complaint with the City alleging that one of his supervisors, the Police Chief, had called him derogatory names.[1] The City hired an independent firm to investigate the complaint and following their investigation they found the complaint was not credible. Echols signed a statement stating he was satisfied with the investigation and testified at trial that he was extremely satisfied with the investigation.

On May 6, 2007, the City hired Jeff Rupp ("Rupp") as the supervisor of Echols's immediate supervisor, Larry Meyer ("Meyer"). Rupp testified that his process for dealing with employment performance issues was to document them.

Following Echols's complaint and Rupp's employment, Echols received at least twenty written complaints in six months regarding his work performance.

Echols also claimed a number of additional instances of alleged retaliatory conduct including: closer monitoring; being forced to drive a City vehicle; being forced to sign a waiver of liability for a personal desk brought by Echols to work or assent to its removal; and an investigation into Echols's work performance.

In September 2007, the City learned Echols had an outstanding arrest warrant for a speeding ticket from a different jurisdiction. The City suspended Echols until this issue was resolved. Echols paid the speeding ticket and returned to work shortly thereafter.

On October 4, 2007, Echols submitted an Equal Employment Opportunity Commission ("EEOC") interview form to initiate a charge of discrimination against the City for his suspension in September and alleged continuing discriminatory treatment. The charge was officially filed by the EEOC on November 8, 2007.

On October 17, 2007, Echols sent a letter to the City complaining about the circumstances surrounding his suspension, alleged discrimination, and accused his supervisors of fabricating information. Echols signed that letter with his proper name twice and finally with his nickname "Zodiac."[2] Blackburn, the City Administrator, testified that he interpreted the use of the name "Zodiac" as a threat, since he had previously informed Echols that the name reminded him of the Zodiac serial killer from the 1960's.

---

1. In his written complaint to his employer, Echols alleged Mills had called him derogatory names such as "Boy," and "Big Boy."

2. The evidence established that Echols used the nickname "Zodiac" and his personalized license plate bore that designation.

On October 18, 2007, Rupp wrote a letter to David Blackburn, the City Administrator, stating that Echols's employment should be terminated for poor work performance and because he accused his supervisors of lying. On October 19, 2007, Rupp and Meyer took pictures of full trash cans around the City's buildings to document what they believed was Echols's failure to adhere to the cleaning schedule. When confronted that day, Echols said he did not need to adhere to the cleaning schedule.

On October 23, 2007, Echols was terminated for poor work performance and because the use of the nickname "Zodiac" on the letter of October 17th was considered a threat as an allusion to the serial killer of the same name.

The morning before trial, Echols dismissed Count I of his petition for race discrimination and proceeded only on Count II, retaliation under the Missouri Human Rights Act ("MHRA"). Echols sought damages for two years of back pay of his salary, $60,000, punitive damages, attorney fees and costs. The trial court granted the City's Motion for Directed Verdict at the Close of Plaintiff's Case on the submissibility of punitive damages but denied such motion as to Echols's retaliatory discharge claim. The jury found that the City did retaliate against Echols and returned a verdict in his favor for $463.00, which amounted to one week's salary.

Echols sought statutory attorney fees pursuant to MHRA Section 213.111[3] in the amount of $66,420.00 from the court in its post trial motion. A hearing was held on August 21, 2009 on the Motion for Attorney Fees. The trial court reduced Echols's request for attorney fees to $4,000 plus costs.

The City filed a Motion for Judgment Notwithstanding the Verdict claiming Echols failed to make a submissible case and also sought to offset the verdict by the amount of unemployment benefits already paid to Echols. At the hearing on August 21, 2009, the trial court denied the City's request to amend their answer to add the affirmative defense of offset or credit for unemployment benefits paid. On August 28, 2009, the trial court entered a judgment based on the jury verdict of $463.00, but reduced this award by the amount of unemployment benefits previously paid to Echols, which reduced his actual damages verdict to zero. Echols now appeals.

### Analysis

In Point Three, Echols argues the trial court erred in reducing Echols's $463.00 verdict to zero using unemployment benefits received as an offset or credit because an offset or credit is an affirmative defense that was waived by the City because it was not pled.

### Standard of Review

■ Whether the trial court should deduct unemployment benefits received during the period covered by a backpay award is reviewed for abuse of discretion. *E.E.O.C. v. Fin. Assurance, Inc.*, 624 F.Supp. 686, 694 (Mo.App. W.D.1985).

### Analysis

■ Credits and offsets are affirmative defenses. *See Roth v. Roth*, 176 S.W.3d 735, 738 (Mo.App. E.D.2005) ("Defendant plainly stated that he was entitled to credits and ... intended to raise an affirmative defense concerning credits and set-offs."); *see also Norman v. Wright*, 100

**3.** All statutory citations are to RSMo 2000 as updated through the 2009 Cumulative Supplement, unless otherwise indicated.

S.W.3d 783, 785–86 (Mo. banc 2003) (holding a credit pursuant to Section 537.060 is an affirmative defense that must be pleaded and proved and seeking credit following verdict not allowed). "A defendant must plead his affirmative defenses in his answer to the suit or they will be deemed waived." *Roth,* 176 S.W.3d at 738 (citing *Mobley v. Baker,* 72 S.W.3d 251, 258 (Mo. App. W.D.2002)). "The purpose of pleadings is to present, define, and isolate the issues so the trial court and all of the parties have notice of those issues." *CAD-CO, Inc., v. Fleetwood Enters., Inc.,* 220 S.W.3d 426, 440 (Mo.App. E.D.2007) (citing *Norman,* 100 S.W.3d at 786). "Accordingly, '[t]he relief awarded in a judgment is limited to that sought by the pleadings.' " *Id.* (quoting *Norman,* 100 S.W.3d at 786).

■ In the present case, the City failed to plead an affirmative defense of credit or offset. The City argues it raised the affirmative defense in its responsive pleading when it averred that "Plaintiff's claims are barred in whole or in part by Plaintiff's failure to mitigate damages."[4] This pleading is insufficient because it is merely a legal conclusion. In pleading an affirmative defense, "it is necessary to set out the factual basis for the affirmative defense 'in the same manner as is required for the pleading of claims under the Missouri Rules of Civil Procedure.' " *Damon Pursell Constr. Co. v. Mo. Highway & Transp. Comm'n,* 192 S.W.3d 461, 475 (Mo.App. W.D.2006) (quoting *Curnutt v. Scott Melvin Transp. Inc.,* 903 S.W.2d 184, 192 (Mo.App. W.D.1995)). " 'A pleading that makes a conclusory statement and does not plead the specific facts required to support the affirmative defense fails to adequately raise the alleged affirmative defense, and the alleged affirmative defense fails as a matter of law.' " *Clean the Uniform Co. St. Louis v. Magic Touch Cleaning, Inc.,* 300 S.W.3d 602, 612 (Mo. App. E.D.2009) (quoting *Eltiste v. Ford Motor Co.,* 167 S.W.3d 742, 752 (Mo.App. 2005)). Accordingly, since the City cited no facts to support its contention that Echols failed to mitigate damages, that affirmative defense must fail.

■ The City also argues that Echols impliedly consented to trying the issue of whether unemployment benefits should be used to offset an award of backpay even though it was not raised in the pleadings.

> Rule 55.33(b) provides that issues not raised by the pleadings which are tried by express or implied consent of the parties shall be treated in all respects as if they had been raised in the pleadings. The rule further provides that the pleadings may be amended to conform to the evidence but the failure to amend does not affect the result of the trial on those issues.

*Buttram v. Auto–Owners Mut. Ins. Co.,* 779 S.W.2d 1, 3 (Mo.App. W.D.1989). "In determining whether a claim was tried by implied consent, the court must examine whether the evidence which would give rise to an amendment of the pleadings bears solely on the proposed new issue and is not relevant to some other issue already in the case." *Muir v. Ruder,* 945 S.W.2d 33, 36 (Mo.App. E.D.1997) (citing *Lester v. Sayles,* 850 S.W.2d 858 (Mo. banc 1993)). The City cites a number of instances in which unemployment benefits are addressed in pre-trial motions, usually prompted by the plaintiff's efforts to exclude them from trial, but these instances are irrelevant. What is relevant is whether evidence pertaining solely to the issue

---

4. The City's argument that Echols's seeking and receiving unemployment compensation after being terminated should be construed as a *failure to mitigate his damages* is an argument that strains credibility.

of unemployment benefits was offered into evidence at trial without objection. The only such evidence the City can identify is an offer of proof that the judge accepted after the plaintiff successfully objected to the admission of the unemployment benefits evidence at trial. An offer of proof, however, is not evidence admitted at trial and cannot serve as a basis for concluding that Echols impliedly consented to let the issue of unemployment benefits into trial. "The purpose of an offer of proof is to ensure that the trial court and opposing counsel understand the proposed evidence and that the appellate court understands claims of error." *Forester v. Dir. of Revenue*, 85 S.W.3d 122, 125 (Mo.App. W.D. 2002) (citing *Russell v. Dir. of Revenue*, 35 S.W.3d 507, 509–10 (Mo.App. E.D.2001)).

The trial court never allowed the City to amend the pleadings to raise the affirmative defense of unemployment benefits received as a credit or an offset, and Echols did not impliedly consent to the issue being decided by the trial court. In fact, Echols objected to the admission of the evidence, and the trial court sustained that objection. Accordingly, the trial court abused its discretion when, on its own initiative in the Judgment, it decided that the issue had been admitted at trial, presumably through implied consent, and deducted unemployment benefits received from Echols's backpay award.

Further, even if the affirmative defense of offset had been properly pled or tried by implied consent, unemployment benefits received should not serve to mitigate a jury award for backpay where the employer is being punished for illegal conduct. Missouri law is sparse on this specific issue. Generally, plaintiffs are not entitled to a double recovery of compensatory damages. *See Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 619 (Mo. banc 1995);

[A] party may not recover duplicative damages for the same wrong. While entitled to be made whole by one compensatory damage award, a party may not receive the windfall of a double recovery, which is a species of unjust enrichment and is governed by the same principles of preventive justice.

*R.J.S. Sec., Inc. v. Command Sec. Services, Inc.*, 101 S.W.3d 1, 17 (Mo.App. W.D.2003) (citing *Inauen Packaging Equip. Corp. v. Integrated Indus. Serv.*, 970 S.W.2d 360, 368 (Mo.App. W.D.1998)). However, the collateral source rule provides that the tortfeasor should not benefit from sources of payment to the victim independent of himself. *See Washington by Washington*, 897 S.W.2d at 619. Therefore, an essential consideration in determining whether unemployment compensation benefits could be used to offset an award for backpay is the source of the compensation. This court in *Phipps v. School District of Kansas City*, 645 S.W.2d 91 (Mo.App. W.D.1982), addressed this issue and found that *if* the employer was the source of the unemployment compensation, then the employee's damages may be reduced by that amount. *Id.* at 105. However, the holding seems to run contrary to the purpose of both unemployment compensation statutes and awards for retaliatory discharge. Unemployment compensation does not serve to indemnify employers from tort liability, but is designed to "alleviate adversity and promote the public welfare." *Burens v. Wolfe Wear–U–Well Corp.*, 236 Mo.App. 892, 158 S.W.2d 175, 179 (1942). Whether Echols succeeded in his claim for retaliatory discharge against his employer had no bearing on his receipt of unemployment benefits. It would be anomalous, now that the employer has been found guilty of discharging Echols in retaliation, to allow the employer to benefit from a state mandated

unemployment insurance fund. *See e.g. Beck v. Edison Bros. Stores, Inc.,* 657 S.W.2d 326, 331 (Mo.App. E.D.1983) (rejecting defendant employer's argument for set-off for medical plan's payments to employee because the plan's provision of medical benefits and disability payments was not created to indemnify defendant against liability). This would serve to negate the jury's award of compensatory damages, a recognition of the wrongdoing of the employer, with a fund, the purpose of which is to serve the good of public welfare and social stability. However, we do not have to reach this precise legal issue because the City failed to properly plead the affirmative defense of offset or credit.

Point Three is granted.

Because the City waived any potential offset or credit for unemployment benefits received, it is unnecessary to address Echols's Point Four on appeal.

### Conclusion

The trial court's offset of the actual damage award by the amount of unemployment benefits is reversed, and the jury's award of actual damages in the amount of $463.00 is reinstated. In all other respects the judgment of the trial court is affirmed. A memorandum discussing the additional points not covered in this opinion has been furnished to the parties pursuant to Rule 84.16(b). *See Lakeridge Enters., Inc. v. Knox,* 311 S.W.3d 268, 272 (Mo.App. W.D.2010); *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.,* 155 S.W.3d 50, 58 (Mo. banc 2005); *In re Marriage of Accurso,* 234 S.W.3d 556, 557 (Mo.App. W.D.2007).

All concur.